UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VIOLET HARPER, on behalf of
SCOTT HARPER,

              Plaintiff,                             Civil Action No. 13-CV-13661

vs.                                            HON. MARK A. GOLDSMITH

COMMISSIONER OF SOCIAL
SECURITY,

              Defendant.

_____/

**OPINION AND ORDER (1) GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. 12), (2) GRANTING IN
PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (DKT. 13), and (3) REMANDING TO THE COMMISSIONER**

## I.    INTRODUCTION

In this social security case, Plaintiff Violet Harper, on behalf of her late husband, Scott

Harper, appeals from the final determination of the Commissioner of Social Security, denying

her husband's application for disability benefits under the Social Security Act, 42 U.S.C. § 1381

et seq.[1]   Mr. Harper protectively filed for social security on November 5, 2008, claiming

disability beginning on June 1, 2005, resulting from post-traumatic stress disorder, borderline

personality disorder, antisocial personality disorder, and chronic migraines.  Pl. Br. at 2 (Dkt.

12).  Mr. Harper's ability to work was further limited after he suffered a heart attack in 2010,

which required a stent and two catheterizations.  Id. at 3.

A hearing on Mr. Harper's application was held before Administrative Law Judge

("ALJ") Ethel Revels on September 15, 2011, at which point Mr. Harper's alleged onset date of

_____

[1] Mr. Harper passed away while the request for review of his denial was pending.  Pl. Br. at 2,
n.1 (Dkt. 12); Administrative Record ("A.R.") at 6 (Dkt. 9).  Plaintiff, as Mr. Harper's widow, is
entitled to any past-due benefits pursuant to 20 C.F.R. §§ 404.503(b)(1) and 416.542(b)(1).

disability was amended to November 28, 2008.  Administrative Record ("A.R.") at 18 (Dkt. 9).

On February 16, 2012, the ALJ issued a decision declaring that Mr. Harper was not disabled

from the amended date of onset through the date of the decision.  Id. at 27.  Mr. Harper requested

review of this decision, id. at 8, and the Appeals Council denied the request, id. at 1.  At that

point, the ALJ's decision became the final decision of the Commissioner.  Wilson v. Comm'r of

Soc. Sec., 378 F.3d 541, 543-544 (6th Cir. 2004).  Plaintiff then filed a complaint in this Court to

contest the ALJ's decision (Dkt. 1).  The parties have filed cross-motions for summary judgment

(Dkts. 12, 13).[2]

For the reasons set forth more fully below, the Court will grant in part and deny in part

each of the party's motion based on the following conclusion.  The Court concludes that the ALJ

adequately incorporated Mr. Harper's limitations regarding his memory and concentration into

the hypothetical posed to the Vocational Expert ("VE") during the hearing, but the ALJ did not

apply the proper legal standards in formulating Mr. Harper's residual functional capacity

("RFC") assessment.  Therefore a remand is necessary.

## II.    BACKGROUND

### A.  Testimony and Statements

Mr. Harper was born in 1961; he was 47 years old as of the amended onset date, and 50

years old at the time of the ALJ's decision.  Pl. Br. at 3.  Mr. Harper had a high-school education

and had previously engaged in a variety of landscaping and construction work.  A.R. at 37, 72-

75.  From 2005 to 2010, Mr. Harper served multiple jail sentences for a variety of offenses,

including insufficient-funds checks and non-payment of child support, which largely precluded

---

[2] Although this case was originally referred to Magistrate Judge R. Steven Whalen, see Notice of
Referral (Dkt. 3), the Court subsequently entered an Order withdrawing the reference to the
Magistrate Judge.  10/24/2014 Order (Dkt. 14).

his ability to work. Id. at 37-39. Since then, Mr. Harper engaged only in a brief work evaluation through Michigan Rehabilitation Services performing warehouse work. Id. at 39-40.

Mr. Harper testified that he suffered a heart attack in September 2010, which required a stent and two catheterizations. Id. at 42-43. Mr. Harper testified that, since his heart attack, he would experience chest pain when performing strenuous activity that raised his heart level, particularly when he lifted heavy objects. Id. at 43.

Mr. Harper also testified that he took Prozac, Seroquel, Requip, Efficort, Metoprolol, Lamictal, Zocor, Aspirin, Lisinopril, and Prilosec on a daily basis, and Nitroglycerin as needed. Id. at 43-45. He indicated that his medication caused him fatigue, coughing, and dizziness that would last for about six hours during the day. Id. at 46. To alleviate those symptoms, Mr. Harper testified that every day he would lie down to rest. Id. at 47.

Mr. Harper testified that he sought mental-health treatment starting in 2008 for depression, anxiety, panic attacks, and mood swings; he also indicated that he suffered from alcoholism and drug addiction for much of his life. Id. at 50-51. Mr. Harper further stated that he had problems with authority figures and people more generally, and had been diagnosed with anti-social behavior. Id. at 53. He also experienced anxiety and panic attacks when in a group of five or more people. Id. According to the testimony, Mr. Harper was subject to mood swings that caused him to become irritable and even violent, but medication and therapy had tempered his mood swings and helped him to control his anger. Id. at 55, 61-62. Mr. Harper also testified that he suffered from depression, but that medication and therapy had helped him to cope. Id. at 55-56. Mr. Harper also stated that auditory hallucinations kept him awake at night; he described the hallucinations as sounds that made him think someone was in the house or at the door. Id. at 58-59. Occasionally, he saw "shadows out of the corner of [his] eye." Id. at 59. Mr. Harper also

indicated that he suffered from post-traumatic stress disorder as a result of being molested as a child, having an abusive father, and being in and out of prison. Id. at 66.

Mr. Harper stated that he slept only four to five hours a night due to nightmares and racing thoughts. Id. at 51. Mr. Harper attributed his fatigue to his lack of sleep and his medications. Id. Mr. Harper also testified that he had weekly migraines that could last three or four days. Id. at 51-52. He treated the migraines with over-the-counter medication and by lying down in a quiet and dark room. Id. at 52. Mr. Harper's history with drug dependency prevented him from receiving any type of stronger narcotic or painkiller, although he had previously been prescribed Depakote, which provided relief. Id. at 52-53. Mr. Harper was also diagnosed with sleep apnea and used a CPAP machine every night. Id. at 65. Mr. Harper testified that he also had restless leg syndrome which caused him pain whenever he sat or stood for longer than ten minutes at a time; he estimated that he could walk about a block and a half before having to stop. Id. at 48.

Mr. Harper stated that he had poor short-term memory; for example, he would go to the grocery store but forget what he intended to purchase. Id. at 56-57. Mr. Harper stated that he tried taking welding classes but quit because he had problems concentrating and was anxious. Id. at 62-63. Mr. Harper testified that he could not concentrate on a television program for more than ten minutes, and that he only drove a few times a month because he got dizzy and did not "pay attention like [he] should." Id. at 63-65.

In an adult-function report dated December 15, 2008, Mr. Harper wrote that his conditions prevented him from "sociali[zing], deal[ing] with others, hold[ing] a job, [and] function[ing]." Id. at 251. Mr. Harper described his daily activities as going to the library, taking walks, cooking, and watching television. Id. at 250. Mr. Harper reported no problems

with personal care, cooking, or performing household chores, id. at 251-252, but he did report

having problems sleeping at night, id. at 251.  According to the report, Mr. Harper cooked much

more frequently than before, often preparing complete meals over a couple of hours.  Id. at 252.

He indicated that he enjoyed cooking and reading, and did both of these activities well.  Id. at

254.  Mr. Harper wrote that he did not spend time with others, and described himself as

aggressive, anti-social, and depressed; he had been previously terminated from employment

because of his inability to tolerate authority figures.  Id. at 254-255, 256.  Mr. Harper reported

that he could only pay attention for short periods of times and often did not finish what he

started; on a good day he could follow written instructions, but he struggled with understanding

spoken instructions.  Id. at 255.[3]

### B.  Medical Records

#### 1.  Treating Sources

##### i.  Northeast Michigan Community Mental Health

Mr. Harper sought mental health treatment from Northeast Michigan Community Mental

Health on October 27, 2008.  A.R. at 341.  On an intake form, Mr. Harper reported severe and

frequent headaches, but indicated that they did not impose any disability restrictions.  Id. at 345.

He reported treating his headaches on a daily basis with Excedrin Migraine.  Id. at 346.  He also

reported heavy tobacco (one to one and a half packs of cigarettes daily) and caffeine (two pots of

coffee daily) use.  Id.  During the intake assessment, Mr. Harper described having problems with

depression, anxiety, ability to sleep, and anti-social behavior, some of which he attributed to the

recent death of his son, which occurred while Mr. Harper was in prison.  Id. at 347.  Mr. Harper

also referenced a history of violence.  Id. at 347, 348, 350.  The clinician conducting the

---

[3] A third-party adult-function report completed by a friend mirrored much of Mr. Harper's self-report.  See A.R. at 284-291.

assessment characterized Mr. Harper as cooperative, accessible, and having appropriate affect, and noted that he related well and maintained good eye contact.  Id. at 348-349.  He demonstrated adequate abstract thinking and relevant thought processes, but exhibited both recent and remote memory impairment.  Id. at 349-350.  Mr. Harper reported serious problems in his ability to concentrate and maintain focus.  Id. at 350.  He did not report any hallucinations.  Id. at 351.  The clinician found signs of polysubstance dependence, borderline personality disorder, antisocial personality disorder, and post-traumatic stress disorder.  Id. at 352. His global assessment of functioning ("GAF") was rated at a 34.  Id. at 353.[4]

In February 2009, Mr. Harper underwent a psychiatric/psychological examination with Dr. Margaret Cappone, Ph.D.  Id. at 364.  He reported symptoms similar to those reported upon his intake and also reported flashbacks and obtrusive thoughts and memories.  Id. at 364-365, 369.  At the time, Mr. Harper was taking Paroxetine for his depression and he reported that it was helping.  Id. at 365.  Dr. Cappone wrote that Mr. Harper presented with subpar hygiene, but maintained good eye contact and was accessible.  Id. at 368.  Dr. Cappone confirmed the clinician's diagnoses from Mr. Harper's intake and rated Mr. Harper's GAF at a 48.  Id. at 371.

Mr. Harper also saw Dr. Carolyn S. Koppenol, M.D., that same month, who rated Mr. Harper's GAF at a 36.  Id. at 389.  Mr. Harper told Dr. Koppenol that he had started taking Paxil, which helped him to feel "a little more laid back."  Id. at 387.  Dr. Koppenol wrote that Mr. Harper's "[m]emory and intellect [were] intact."  Id. at 389.  Dr. Koppenol diagnosed Mr. Harper with bipolar disorder and polysubstance abuse, and he was prescribed Depakote, Seroquel, and Paxil.  Id.

---

[4]  A "global assessment of functioning" or "GAF" "measure[s] psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations."  White v. Comm'r of Soc. Sec., 572 F.3d 272, 276 (6th Cir. 2009).

In March 2009, Mr. Harper underwent a medication review; he reported that the Depakote helped to manage his mood swings and his aggression, but that the Seroquel was less effective at helping him sleep than in the past. Id. at 378. Mr. Harper felt "[p]retty decent," and appeared pleasant and without distress. Id. at 379. Some months later, in May 2009, Mr. Harper reported severe anxiety and agitation. Id. at 474. He noted that he had not been taking his Abilify as prescribed because he could not afford it; he was given samples of the drug. Id.[5] He continued to report feelings of severe anxiety, agitation, and anger. Id. at 466, 467, 472. Mr. Harper complained that the Abilify was less effective at treating his anger than the Depakote and that his headaches had returned since being taken off the Depakote. Id. at 466. Consequently, it appears that Mr. Harper was restarted on the Depakote. Id. Mr. Harper relapsed into substance abuse in June 2009. Id. at 461. He attributed his relapse to stress related to a new girlfriend. Id. Mr. Harper often complained that his medications were not helping, and he would frequently request adjustments. Id. at 445, 446, 447, 448, 449, 456, 458. At some point, Mr. Harper had been prescribed BuSpar and, in late August 2009, he reported that it was helping with his anxiety. Id. at 444. Mr. Harper continued to indicate improvement with increased medication, but requested medication for panic disorder. Id. at 437, 441, 442-443.

At an annual assessment in November 2009, Mr. Harper's memory and concentration were found to be adequate, and he was cooperative, accessible, and related well. Id. at 429-430. The Depakote continued to help with his migraines. Id. at 428. In late 2009 and early 2010, Mr. Harper indicated that his medications were working, his moods had improved, and he was sleeping better at night; reports also indicate he was doing well in group therapy. Id. at 411, 417, 419.

---

[5] It appears that at some point, Mr. Harper was taken off the Depakote and placed on Abilify, although it is unclear when or why this occurred. See A.R. at 467.

### ii.     Thumb Alliance

Starting in May 2010, Mr. Harper sought mental-health treatment through Thumb Alliance.  According to the mental-health assessment, Mr. Harper had run out of his previous medications, which included Depakote, Paxil, Seroqel, Cogentin, and "Busbar."[6]  A.R. at 485. He reported increased symptoms in depression, irritability, sleep disturbance, anxiety, and paranoia.  Id. at 486-488, 491-492.  Although Mr. Harper denied hallucinations, he admitted to occasionally seeing shadows.  Id. at 487.  Mr. Harper showed no impairment in memory, thought content, or intellectual functioning, and appeared to have good concentration.  Id. at 487.  His GAF was rated at a 49.  Id. at 488.   Upon reviewing Mr. Harper's service eligibility criteria, the assessing clinician noted that Mr. Harper suffered from "substantial disability/functional impairment," "such that self-sufficiency is markedly reduced" in categories such as his personal hygiene and self-care, his self-direction, his activities of daily living, his learning and recreation, and his social transactions and interpersonal relationships.  Id. at 564.

Mr. Harper was prescribed Lamotrigine and Fluoxetine, which were successful in improving his mood and reducing his irritability.  Id. at 493, 494-495, 496, 536, 543.  He also reported improved sleep upon restarting Seroquel.  Id. at 536.  Reports stated that Mr. Harper showed signs consistent with narcissism.  Id. at 494, 496.  Mr. Harper's psychiatrist suspected Mr. Harper of "fishing for more [C]ogentin," which is "common among former addicts" as Cogentin "is abused a lot."  Id. at 537.  Mr. Harper was discharged from Thumb Alliance's program in May 2011.  Id. at 527-529.

### iii.     North Country Community Mental Health

Mr. Harper moved to northern Michigan in April of 2011 and sought mental-health treatment from North Country Community Mental Health.  A.R. at 580.  During his intake

---

[6] The Court assumes the reference to "Busbar" presumably means "BuSpar."

8

assessment, Mr. Harper stated that he suffered from bipolar disorder, anti-social and borderline personality disorder, post-traumatic stress disorder, depression, and anxiety; Mr. Harper also reported symptoms of anxiety and panic. Id. Mr. Harper reported that medication was effective at managing his symptoms. Id. The assessment form suggests that Mr. Harper was still having difficulty sleeping, occasionally staying up "for a couple days at a time with no need to sleep," but noted also that "this ha[d] been less frequent than in the past." Id. Mr. Harper also complained of restless leg syndrome, sleep apnea, high blood pressure, and high cholesterol. Id. at 581. According to the assessment, Mr. Harper appeared cooperative, with appropriate affect, and had adequate thought processes and thought content. Id. at 581-582. Records indicate his concentration and immediate retention and recall were impaired. Id. at 583. His GAF was rated at a 52. Id. at 586.

In June 2011, Mr. Harper underwent a psychiatric evaluation with Dr. Lori A. Katzman, M.D. Id. at 589. The clinical history indicates that Mr. Harper reported similar symptoms as during previous psychiatric reviews, including depression, anger, anxiety, mood swings, and prior substance abuse. Id. Mr. Harper reported that he had become better at managing his anger than in the past. Id. The report also noted that Mr. Harper did not consistently use his CPAP machine. Id. at 590. Mr. Harper was described as "pleasant and cooperative," with adequate thought processes and cognition. Id. at 590. He was diagnosed with dysthymic disorder, post-traumatic stress disorder, anxiety disorder, polysubstance dependence, caffeine disorder, borderline personality disorder, and antisocial disorder. Id. at 591. The treatment plan indicates that Mr. Harper was to increase his Prozac and continue with the Seroquel and the Lamictal; Mr. Harper was also advised to "reduce his use of caffeine to help with [] difficulties with sleep and anxiety," and was "encouraged to use his C-PAP more frequently." Id.

### iv.   Port Huron Hospital

In September 2010, medical records state that Mr. Harper arrived at the Port Huron Hospital emergency room with symptoms of nausea and chest pain that started while he was riding his bike. A.R. at 499. He was diagnosed with acute inferior wall myocardial infarction with lateral extension, one brief episode of sinus bradycardia, and hypertension. Id. at 499-500. He received a stent, id. at 522, and underwent two catheterizations. Id. at 506, 517. It was also recommended that Mr. Harper undergo a sleep study for suspected sleep apnea. Id. at 507. Mr. Harper was also advised to stop smoking. Id.

### 2.   Non-Treating Sources

Cynthia Gaudette performed a case analysis on February 18, 2009, and classified Mr. Harper's physical impairments as not severe. A.R. at 373. Ms. Gaudette noted that both Mr. Harper's self-reported and third-party reported activities of daily living indicated that he suffered no limitations resulting from his bronchitis or his headaches. Id. Consequently, Ms. Gaudette found Mr. Harper's statements to be only partially credible. Id.

Wayne Hill, Ph.D., performed a psychiatric review technique on April 9, 2009, concluding that an RFC assessment was necessary, based on the presence of anxiety-related disorders, personality disorders, and substance addiction disorders. Id. at 392. Dr. Hill found that Mr. Harper's symptoms caused a mild restriction in his activities of daily living and in his ability to maintain concentration, persistence, or pace, and that Mr. Harper's social functioning was moderately impaired. Id. at 402.

On the same day, Dr. Hill also prepared a mental RFC assessment, concluding that Mr. Harper had moderate limitations in several areas, including: understanding and remembering detailed instructions; maintaining attention and concentration for extended periods of time;

performing activities within a schedule and maintaining regular attendance and normal punctuality; and interacting appropriately with the public.  Id. at 406-407.  Dr. Hill summarized that Mr. Harper had an extensive history of antisocial behavior, but that Mr. Harper was aware of the consequences of such behavior.  Id. at 408.  Dr. Hill also found that Mr. Harper's understanding and memory were "mildly to moderately limited," that his "capacity for sustained concentration and persistence [was] moderately limited," and that his social interactions and ability to adapt were "moderately limited."  Id.  However, Dr. Hill found Mr. Harper capable of working step one and step two tasks on a sustained basis.  Id.

### C. Vocational Expert Testimony

The vocational expert ("VE"), Susan Rowe, testified at the hearing.  A.R. at 72-80.  The ALJ posed the following hypothetical to the VE:

> Assume . . . a person of the claimant's age, educational level, and work experience . . . needs work that is simple, repetitive type tasks because there are some mental health issues.  There is also some difficulty, what I would rate as moderate limitation of the ability to maintain concentration for extended periods, as well as to carry out detailed instructions which would restrict him to simple, repetitive tasks which I am using to describe unskilled work.  That work also must not be with the general public, not under close supervision, must be in a relatively clean air environment, must not be at hazardous heights or around dangerous machinery, nor in close proximity to coworkers.

Id. at 76.  The ALJ then built upon her first hypothetical by further restricting Mr. Harper to jobs at the "light level," then allowing for a "sit/stand option," and finally requiring that there be no more than five people present in the room.  Id. at 77-78.  The VE testified that "[t]here would be a few assembler positions": 1,800 in Michigan and 12,000 nationally; and that there would be "some machine tender positions": 2,000 in Michigan and 18,000 nationally.  Id. at 78.

Mr. Harper's attorney inquired about a hypothetical individual with "headaches which require him to lie down in a dark room. . . . [and who] has feelings of fatigue on a daily basis

11

where he is reclining or lying down four to six hours during the day so that he would be off task more than 20 percent of the time." Id. at 79. The VE testified that such a person would be precluded from work. Id. Mr. Harper's attorney also inquired about an individual whose concentration was limited such that he was off task "more than 20 percent of the time." Id. at 79-80. The VE testified that such a limitation would also make work preclusive. Id.

### III.   STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court's "review is limited to determining whether the Commissioner's decision 'is supported by substantial evidence and was made pursuant to proper legal standards.'" Ealy v. Comm'r of Soc. Sec., 594 F.3d 504, 512 (6th Cir. 2010) (quoting Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Lindsley v. Comm'r of Soc. Sec., 560 F.3d 601, 604 (6th Cir. 2009) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). In determining whether substantial evidence exists, the Court "may look to any evidence in the record, regardless of whether it has been cited by [the ALJ]." Heston v. Comm'r of Soc. Sec., 245 F.3d 528, 535 (6th Cir. 2001). "[T]he claimant bears the burden of producing sufficient evidence to show the existence of a disability." Watters v. Comm'r of Soc. Sec., 530 F. App'x 419, 425 (6th Cir. 2013).

"Disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In determining whether an individual is disabled, the Commissioner applies the following five-step sequential disability analysis: (i) whether the claimant performed substantial gainful activity during the disability period; (ii) whether the

12

claimant has a severe medically determinable impairment; (iii) whether the claimant has an impairment that meets or equals a listed impairment; (iv) whether the claimant, in light of his RFC can return to his past relevant work; and (v) if not, whether the claimant, in light of his RFC and his age, education, and work experience, can make an adjustment to other work.  See 20 C.F.R. § 416.920(a) (explaining the five-step sequential evaluation process).  Plaintiff has the burden of proof for the first four steps, but, at step five, the burden shifts to the Commissioner to show that "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy."  Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990).

## IV.    THE ALJ'S DECISION

The ALJ based her decision on an application of the Commissioner's five-step sequential disability analysis to Mr. Harper's claim.  The ALJ found as follows:

- Under Step One, Mr. Harper met the insured status requirements through December 31, 2010, and had not engaged in any substantial gainful activity since November 28, 2008, the alleged onset date of disability.  A.R. at 20.

- Under Step Two, Mr. Harper had the following severe impairments: "residuals status post coronary artery disease, obstructive sleep apnea, restless leg syndrome, migraines, obesity, personality disorder, posttraumatic stress disorder (PTSD), and polysubstance abuse."  Id.

- Under Step Three, Mr. Harper did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.  Id. at 21.

- Under Step Four, Mr. Harper had the RFC "to perform a range of work at the light exertional level but [with] the following limitations: [Mr. Harper] requires simple, repetitive tasks or unskilled work due to symptoms from depression.  [Mr. Harper] can do no work with the general public, and cannot have close supervision or be in close proximity to coworkers.  [Mr. Harper] cannot work at hazardous heights or around dangerous machinery.  [Mr. Harper] requires a clean air environment and the ability to sit and stand at will."  Id. at 22.  Mr. Harper was unable to perform past relevant work.  Id. at 26.

13

- Under Step Five, Mr. Harper had the age, education, work experience, and RFC to perform the following jobs that existed in significant numbers in the national economy: assembler (1,800 jobs regionally and 12,000 jobs nationally) and machine tender (2,000 jobs regionally and 18,000 jobs nationally). <u>Id.</u> at 26-27.

## V.   ANALYSIS

In her brief, Plaintiff challenges the ALJ's decision on two grounds.  First, Plaintiff argues that the ALJ's hypothetical to the VE did not accurately incorporate Mr. Harper's limitations as to memory and concentration and, therefore, the VE's testimony cannot be relied upon for substantial evidence at the Step Five stage.  Second, Plaintiff argues that the ALJ's RFC did not incorporate all of Mr. Harper's severe impairments, as the ALJ failed to describe how the RFC accommodated Mr. Harper's migraines and sleep apnea.  The Court addresses each in turn and determines that remand is warranted on the latter ground.

### A. The ALJ's Hypothetical to the VE Accurately Captured Mr. Harper's Limitations as to Memory and Concentration

"[F]or a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." <u>Ealy</u>, 594 F.3d at 516.  The ALJ's hypothetical need not include a laundry list of the claimant's diagnoses, but it should accurately reflect "the ALJ's assessment of what [the claimant] 'can and cannot do.'" <u>Webb v. Comm'r of Soc. Sec.</u>, 368 F.3d 629, 633 (6th Cir. 2004).

Here, Plaintiff asserts that the hypothetical crafted by the ALJ limited Mr. Harper only to unskilled work and did not adequately call the VE's attention to Mr. Harper's inability to maintain concentration for extended periods of time or to process and carry out detailed

14

instructions.  Pl. Br. at 20 (Dkt. 12).[7]  Specifically, Plaintiff takes issue with the ALJ's statement, as emphasized below:

> Assume . . . a person of the claimant's age, educational level, and work experience . . . needs work that is simple, repetitive type tasks because there are some mental health issues.  There is also some difficulty, what I would rate as moderate limitation of the ability to maintain concentration for extended periods, as well as to carry out detailed instructions which would restrict him to simple, repetitive tasks <u>which</u> <u>I</u> <u>am</u> <u>using</u> <u>to</u> <u>describe</u> <u>unskilled</u> <u>work</u>.

A.R. at 76 (emphasis added).  According to Plaintiff, because of the ALJ's reference to unskilled work, "the VE was not asked to consider the vocational implications of Mr. Harper's specific limitations."  Pl. Br. at 20.  Plaintiff first contends that unskilled work is composed of simple duties that require little to no judgment and can be learned in a short period of time; it is not defined as work that requires little to no concentration.  <u>Id.</u>  Plaintiff further contends that "the VE agreed that a limitation in concentration that would keep a worker 'off task more than 20% of the time' would be 'work preclusive'"; therefore, "a limitation to unskilled work is not the same as a limitation to work requiring reduced concentration, as the latter could be work-preclusive."  <u>Id.</u> at 20-21.  Because the hypothetical failed to capture all of Mr. Harper's limitations, Plaintiff argues, the VE's response cannot support the ALJ's decision that Mr. Harper was not disabled.  <u>Id.</u> at 21.

---

[7] The Court observes that Plaintiff's heading with respect to this argument suggests that the VE's testimony failed to account for Mr. Harper's "moderate limitation with concentration, persistence or pace."  Pl. Br. at 18.  However, Plaintiff's actual argument appears to focus solely on the ALJ's purported failure to call the VE's attention to Mr. Harper's reduced ability to concentrate.  <u>Id.</u> at 21 ("Thus, a limitation to unskilled work is not the same as a limitation to work requiring reduced concentration, as the latter could be work-preclusive.  The ALJ's hypothetical failed to capture Mr. Harper's limitations.").  Because Plaintiff has failed to include or otherwise develop any argument as to any alleged limitations regarding persistence or pace, the Court is permitted to ignore Plaintiff's reference to the same in her heading.  <u>McPherson v. Kelsey</u>, 125 F.3d 989, 995-996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (alterations in original) (citations and internal quotation marks omitted)).

In response, Defendant argues that Plaintiff unduly focuses on one aspect of the ALJ's hypothetical and ignores that the ALJ specifically asked about difficulties with concentration. Def. Br. at 14-15 (Dkt. 13). Defendant further argues that there is no evidence that Mr. Harper's limitations in concentration would put him off task for 20 percent of the work period, and that both the ALJ and Dr. Hill found Mr. Harper to have only mild, not moderate, limitations in concentration, persistence, and pace. Id. at 15.[8] Defendant also asserts that restricting Mr. Harper to simple, repetitive tasks ensured that he would not have been required to maintain concentration for extended periods of time. Id. at 16.[9]

The Court concludes that the ALJ's hypothetical to the VE adequately conveyed Mr. Harper's limitations in memory and concentration. The cases on which Plaintiff relies in support of her argument differ in significant ways than the hypothetical at issue here.

For instance, in Ealy, the ALJ's hypothetical, in relevant part, limited the plaintiff, Ealy, to "simple, repetitive tasks and instructions." 594 F.3d at 516 (internal quotation marks omitted). However, the state psychological consultant had "specifically limited Ealy's ability to sustain attention to complete simple repetitive tasks to '[two-hour] segments over an eight-hour day where speed was not critical," reflecting "some of the restrictions—in pace, speed, and concentration—that both [the state consultant] and the ALJ found Ealy to have." Id. Thus, because the ALJ's hypothetical completely omitted those restrictions, by failing to mention the

---

[8] Defendant subsequently contradicts this assertion with a later reference to "Dr. Hill's finding that Mr. Harper would be moderately limited in his ability to maintain concentration for extended periods." Def. Br. at 16. The record actually indicates that Dr. Hill found that Mr. Harper's "understanding and memory [were] mildly to moderately limited," but that Mr. Harper's "capacity for sustained concentration and persistence [were] moderately limited." A.R. at 408.

[9] Defendant also argues that the ALJ's hypothetical accurately took into account Mr. Harper's exertional and social limitations, but Plaintiff does not contest those aspects of the ALJ's hypothetical.

16

very specific limitations the state consultant described, the Sixth Circuit found that the plaintiff's limitations were not fully conveyed to the VE, and the ALJ could not rely on the VE's response to support his finding.  Id. at 516-517.

Similarly, in Edwards, while the ALJ found that the claimant had "a 'moderate limitation in her ability to concentrate, persist and keep pace,' the ALJ's limitations were with co-workers, supervisors and the public, and to 'jobs entailing no more than simple, routine, unskilled work.'" Edwards v. Barnhart, 383 F. Supp. 2d 920, 930 (E.D. Mich. 2005).  The court found that simple, routine, unskilled work may not sufficiently accommodate the claimant's limitations in concentration and pace because the claimant "may be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job."  Id.

Unlike Ealy and Edwards, here, the ALJ expressly referenced Mr. Harper's moderate limitations in concentration and carrying out detailed instructions in her hypothetical to the VE. A.R. at 76.  The ALJ stated, in pertinent part, "[t]here is also some difficulty, what I would rate as moderate limitation of the ability to maintain concentration for extended periods, as well as to carry out detailed instructions which would restrict him to simple, repetitive tasks which I am using to describe unskilled work."  Id.  Thus, the ALJ's hypothetical here properly called the VE's attention to both Mr. Harper's limitations in maintaining concentration and his limitations in following and carrying out detailed instructions.  The reference to unskilled work does not extinguish the ALJ's earlier reference to Mr. Harper's inability to maintain concentration or focus for extended periods of time.  And while a restriction to unskilled work by itself does not adequately convey limitations with respect to concentration, persistence, or pace, Plaintiff has provided the Court with no indication that the subset of unskilled work the VE identified, and on which the ALJ subsequently relied, would not also accommodate Mr. Harper's identified

17

limitation in concentration.  Therefore the Court has not been presented with any evidence that the VE failed to heed the ALJ's instruction regarding Mr. Harper's reduced ability to concentrate.  Accordingly, the Court concludes that the ALJ applied the proper legal standard here.

### B.  The ALJ's Decision Failed to Address Certain Impairments in the RFC Analysis

In assessing an RFC, social security regulations require the ALJ to consider both severe impairments and non-severe impairments.  20 C.F.R. § 404.1545(e); see also SSR 96-8p, 1996 WL 374184, at *5; White v. Comm'r of Soc. Sec., 312 F. App'x 779, 787 (6th Cir. 2009).  Plaintiff submits that at Step Two, the ALJ found that Mr. Harper had several severe impairments, including obstructive sleep apnea and migraines, but then failed to incorporate those limitations in the RFC assessment, or explain how those impairments were reflected in the assessment.  Pl. Br. at 23-24.  Plaintiff further asserts that, in failing to explain how those impairments affected Mr. Harper's ability to work, the ALJ violated the narrative-discussion requirement, which requires the ALJ to describe how the evidence supports her conclusion.  Id. at 24.  Plaintiff contends that the error is harmful because the VE testified that an individual who must lie down in a dark room 4-6 hours a day, due to headaches and fatigue, would be unable to work.  Id. at 25.

In response, Defendant argues that "[n]othing in the definition of [the RFC] requires an ALJ to specify that this limitation, for example, accommodates a specific impairment."  Def. Br. at 18.  Defendant further contends that the ALJ was merely required to "consider the person's ability to meet the physical, mental, sensory, and [other] requirements of work," and the ALJ did that.  Id.  Specifically, Defendant argues that the ALJ limited Mr. Harper to work with a sit/stand option, which could reasonably accommodate his complaints of fatigue.  Id.  Defendant also claims that there is no evidence indicating that Mr. Harper needed to lie down in a dark room for

4-6 hours a day because of headaches and fatigue, and therefore the ALJ was not required to incorporate those limitations into her assessment. Id. at 19.[10]

The ALJ did, in fact, include Mr. Harper's obstructive sleep apnea and migraines among his "severe" impairments. A.R. at 20. The regulations define a "severe impairment" as one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). Nonetheless, just because a claimant has a "severe impairment," it does not necessarily follow that the claimant's functional work capacity is similarly compromised. Griffeth v. Comm'r of Soc. Sec., 217 F. App'x 425, 429 (6th Cir. 2007). However, to the extent an ALJ determines that an identified impairment, severe or otherwise, does not result in any work-related restrictions or limitations, the ALJ "is required to state the basis for such conclusion." Hicks v. Comm'r of Soc. Sec., No. 12-13581, 2013 WL 3778947, at *3 (E.D. Mich. July 18, 2013); see also Schlicker v. Comm'r of Soc. Sec., No. 10-cv-13697, 2011 WL 5865148, at *11 (E.D. Mich. Nov. 4, 2011) report adopted by No. 10-13697, 2011 WL 5865082 (E.D. Mich. Nov. 22, 2011); Murray v. Colvin, No. 3:12-0410, 2014 WL 5323061, at *12 (M.D. Tenn. Oct. 16, 2014) report adopted by No. 3:12-cv-00410, 2014 WL 5824539 (M.D. Tenn. Nov. 7, 2014). Indeed, "an 'ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning.'" Lowery v. Comm'r of Soc. Sec., 55 F. App'x 333, 339 (6th Cir. 2003) (quoting Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995)).

Some courts have held that an ALJ's failure to adequately explain how an impairment affects an individual's RFC constitutes reversible error. See Widok v. Comm'r of Soc. Sec., No. 1:13-cv-00667, 2014 WL 4064043, at *14 (N.D. Ohio Aug. 15, 2014); Murray, 2014 WL

---

[10] Defendant also argues that the ALJ's RFC sufficiently accommodates Mr. Harper's social limitations but Plaintiff does not contest the ALJ's RFC with respect to those limitations.

5323061 at *12; <u>Hicks</u>, 2013 WL 3778947 at *3.  This may be true even where substantial evidence supports the ALJ's ultimate disability decision.  <u>See</u> <u>Murray</u>, 2014 WL 5323061 at *12 ("The defendant argues that the record does not support the limitations alleged by the plaintiff.  However, while this may be true, it is the role of the ALJ and not the role of the Court to weigh the evidence." (footnote and citation omitted)); <u>Schlicker</u>, 2011 WL 5865148 at *8 (The court "'may not uphold an ALJ's decision, even if there is enough evidence in the record to support it, if the decision fails to provide an accurate and logical bridge between the evidence and the result.'" (quoting <u>Pollaccia v. Comm'r of Soc. Sec.</u>, No. 09-cv-14438, 2011 WL 281044, at *6 (E.D. Mich. Jan 6, 2011) <u>report</u> <u>accepted</u> <u>by</u> No. 09-CV-14438, 2011 WL 281037 (E.D. Mich. Jan. 25, 2011))).

Here, the Court concludes that it is unable to trace the logical reasoning behind the ALJ's decision to characterize Mr. Harper's obstructive sleep apnea as severe, yet otherwise fail to provide any analysis for how the condition affected Mr. Harper's ability, if at all, to perform work on a sustained basis.  The ALJ's decision contains few direct references to Mr. Harper's sleep apnea, mentioning only that Mr. Harper required a CPAP machine, A.R. at 24, 25, and that, at the time of the hearing, Mr. Harper was using his wife's machine because he had been unable to procure his own, <u>id.</u> at 23.  Otherwise the decision merely contains references to Mr. Harper's reports of difficulty sleeping.  There is no additional analysis as to whether the CPAP machine adequately controlled Mr. Harper's sleep apnea or whether the sleep apnea was not so severe as to prevent Mr. Harper from engaging in sustained and meaningful work.

The ALJ's decision did state that, while Mr. Harper's medically determinable impairments could be expected to cause some of his alleged symptoms, his statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to

the extent they are inconsistent with the [RFC]." Id. The ALJ wrote that Mr. Harper's "statements are not fully consistent with the longitudinal medical record to a degree that supports a finding of disability," and, therefore, found Mr. Harper's statements regarding the functional limitations of his symptoms to be "only partially credible." Id. at 25. Ultimately, the ALJ concluded that the RFC was supported by the medical records, which "demonstrate[d] that [Mr. Harper's] limitations [would] not interfere with the ability of [Mr. Harper] to function independently, appropriately, effectively, and on a sustained basis." Id. This language, however, in the absence of some supporting or explanatory statement of analysis, is not sufficient for the Court to conclude that the ALJ made a finding that Mr. Harper's severe obstructive sleep apnea warranted no corresponding functional impairments.

Defendant's argument to the contrary — that by limiting Mr. Harper to light work with an option to sit or stand, the ALJ adequately took into account Mr. Harper's complaints of fatigue — is not persuasive. Def. Br. at 18. There is no indication in the ALJ's opinion that the sit/stand option was included to accommodate any functional limitations caused by Plaintiff's sleep apnea, and Defendant points to none. See Fatum v. Comm'r of Soc. Sec., No. 1:10-cv-302, 2012 WL 716096, at *1 (W.D. Mich. March 6, 2012) ("Defendant's attempt to account for the visual impairment in hindsight, by the ALJ's reference to a machinery and unprotected heights limitation, is based on nothing more than speculation.").

Defendant's further argument, that the medical record does not support Plaintiff's claim that Mr. Harper needed to lie down 4-6 hours a day, in part from fatigue, is also unavailing. Even if the ALJ's RFC is supported by substantial evidence in the record, "it is the role of the ALJ and not the role of the Court to weigh the evidence." Murray, 2014 WL 5323061 at *12.

21

Because the ALJ failed to account for Mr. Harper's obstructive sleep apnea in her RFC assessment, or otherwise explain why no restrictions were necessary, remand is warranted.

Plaintiff also argues that the ALJ similarly failed to account for Mr. Harper's migraines in the RFC assessment. Pl. Br. at 24. The Court observes that, while the ALJ's analysis is certainly not the most detailed, the ALJ does twice note that, according to the medical records, Mr. Harper indicated that medication helped his migraine condition. A.R. at 23, 24. This, coupled with the ALJ's recitation of Mr. Harper's daily activities, suggests that his migraine condition did not create any functional impairment. Consequently, the Court concludes that the ALJ's analysis with respect to Mr. Harper's migraine condition minimally allows the Court to infer that the ALJ believed Mr. Harper's migraine condition to have been adequately controlled.

The ALJ's conclusion with respect to Mr. Harper's migraine condition is also supported by substantial evidence in the record. While Mr. Harper did complain of severe headaches to Northeast Michigan Community Mental Health, see, e.g., id. at 345, 364, he also noted that he treated them with Excedrin Migraine, id. at 346, and that Depakote was also effective, id. at 428. Furthermore, Mr. Harper himself stated on his intake form that he did not have any "disability restrictions" because of his migraine condition. Id. at 345. Although Mr. Harper testified that his headaches became worse after being taken off the Depakote, id. at 52-53, there is little mention of chronic headaches or severe migraines in the remainder of Mr. Harper's medical records subsequent to Mr. Harper's treatment at Northeast Michigan Community Mental Health. A psychiatric examination conducted by Dr. Katzman at North Country Community Mental Health lists a diagnosis of "chronic headaches" under Axis III, but there is no additional or explanatory information associated with that diagnosis. Id. at 591. A diagnosis, however, without more, does not speak to the severity of a condition or its functional limitations. See

<u>Higgs v. Bowen</u>, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition."); <u>see</u> <u>also</u> <u>Hill v. Comm'r of Soc. Sec.</u>, 560 F. App'x 547, 551 (6th Cir. 2014) ("[D]isability is determined by the functional limitations imposed by a condition, not the mere diagnosis of it.").  Therefore, it was reasonable for the ALJ to find that Mr. Harper's migraines did not cause any specific functional limitations that restricted his ability to work.

## VI.   CONCLUSION

For the above-stated reasons, the Court grants in part and denies in part Plaintiff's motion for summary judgment (Dkt. 12), and grants in part and denies in part Defendant's motion for summary judgment (Dkt. 13), and remands for further proceedings consistent with this opinion, pursuant to 42 U.S.C. § 405(g), sentence four.


SO ORDERED.


Dated:  January 26, 2015                     s/Mark A. Goldsmith
      Detroit, Michigan                     MARK A. GOLDSMITH
                                   United States District Judge


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 26, 2015.

                                     s/Johnetta M. Curry-Williams
                                     Case Manager